UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JENNIFER RIVERA,<br><br>                     Plaintiff,<br><br>-against-<br><br>PLS CHECK CASHERS OF NEW YORK, INC., et al.,<br><br>                     Defendants. | 22-cv-5642 (AS)<br><br>MEMORANDUM OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

Jennifer Rivera sued PLS Check Cashers of New York (PLS) and Katherine Guzman for discrimination and retaliation in violation of the New York State Human Rights Law (NYSHRL) and the New York City Human Rights Law (NYCHRL) and for violation of the Wage Theft Prevention Act (WTPA). She also sued only PLS for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII) and only Guzman for aiding and abetting under the NYSHRL and NYCHRL. Defendants move for summary judgment on all claims.

## BACKGROUND[1]

### I.  PLS's hiring process

PLS is a consumer-financial-services retailer offering check cashing, prepaid debit cards, money-transfer services, money orders, and bill payments through its retail stores. Pl.'s Resp. to Defs.' Statement of Material Facts, Dkt. 38 ¶¶ 1–2. PLS stores are staffed by Customer Service Representatives (CSRs). ¶ 16. CSRs report to store managers, who in turn report to district managers. ¶¶ 12, 18.

As of May 2021, PLS required that CSR applicants score "50" or higher on a pre-employment assessment to be eligible for employment. ¶¶ 24–29. PLS contracted with Infor Talent, a third-party company, to administer the assessment. ¶ 24. PLS never had any access to a candidate's assessment answers or the assessment itself and was unable to edit or alter the applicant's assessment score. ¶¶ 35–36.

Infor Talent transmitted the candidate's score, a summary report providing a concise analysis of the candidate's strengths and weaknesses, and an interview guide to PLS's application tracking software, iCIMS. ¶¶ 24, 33. Hiring managers (including district managers and store managers) were able to log in to iCIMS to view candidates. ¶ 37. Each candidate had a homepage that contained their name, contact information, workflow activity, years of professional

---

[1] Unless otherwise indicated, the following facts are undisputed.

experience, and number of job submissions. ¶ 39. The homepage also provided access to other documents, such as an applicant's resume or assessment score. ¶¶ 40–42.

Hiring managers used a candidate's iCIMS homepage to select CSR candidates for interviews. ¶ 37. If a CSR candidate successfully interviewed for the position, the candidate would receive an offer conditional on passing a background check and drug test. ¶ 46. After PLS received confirmation that the candidate passed the background check and drug test, the new hire CSR was scheduled for new-hire orientation. ¶ 48. After an employee completed orientation, their new-hire paperwork was submitted to PLS's HR team so the new-hire information could be entered into PLS's HR-management and payroll software. ¶ 55.

In 2021, PLS preferred that hiring managers confirm that a candidate had a 50-plus assessment score before scheduling them for an interview, but this did not always occur. ¶ 49. Candidates could advance through the iCIMS hiring process without anyone reviewing the assessment score. ¶ 50. However, when HR employees entered the new-hire information, they were required to confirm that the new hire had received a passing assessment score. ¶ 60.

## II. Rivera's employment at PLS

On June 23, 2021, Rivera applied to be a CSR at PLS's Bronx stores. ¶ 71. After completing the online employment application, Rivera received a link to complete the Infor Talent assessment. ¶ 72. Rivera completed the assessment on July 1, 2021. ¶ 73. Due to the COVID-19 pandemic, there was a shortage of CSR applicants for employment in midtown Manhattan. ¶ 76. As a result, Guzman—a district manager in the New York South District—reviewed the applications of CSR candidates who applied for positions in the Bronx and Brooklyn as potential candidates for Manhattan positions. ¶¶ 13, 77. Guzman came across Rivera's application. ¶ 79. Guzman did not check or review Rivera's assessment score in iCIMS. ¶ 83. But Guzman thought she would be a good fit for the 43rd Street store because Rivera's resume reflected prior check-cashing experience. ¶ 80.

The 43rd Street store did not have a store manager at the time, so Guzman asked Marielis Sierra, the store manager at the West 36th Street store, to interview Rivera. ¶ 81. Sierra interviewed Rivera on or about July 16, 2021. ¶ 86. After interviewing Rivera, Sierra recommended that Guzman hire Rivera for the CSR position at the 43rd Street Store. ¶ 92. While Sierra would typically check an applicant's assessment score, she did not check Rivera's score because she believed Guzman had already confirmed that Rivera had passed the assessment. ¶ 90.

On July 16, 2021, Guzman advanced Rivera in the iCIMS system by selecting the "Background Check and Drug Screen Initiated Tab," which invited Rivera to complete a background check and drug test. ¶ 93. Rivera completed her drug test and background check paperwork on July 16, 2021. ¶ 94. Rivera received a report on July 21, 2021, informing her that she passed the drug test and background check. ¶ 98. The next day, Sierra texted Rivera that she had "passed the test" and should attend orientation on July 26th. ¶¶ 95–96.

Rivera attended PLS's new-hire orientation, where she completed new-hire paperwork. ¶¶ 100–101. The paperwork was emailed to the HR team, copying the email distribution lists for the New York South district managers (which included Guzman). ¶¶ 104–105. After the orientation, Rivera messaged Sierra asking when and where she should report to work. ¶ 106. She also told Sierra that she had a prenatal appointment on July 29th. ¶ 107. Sierra responded, "Are you pregnant? 🤭🤭." ¶ 108. Rivera responded "Yes, I am expecting is that ok?" and Sierra asked, "Why didn't you [tell] me at the interview?" ¶ 109. Sierra also told Rivera she should report to work the next day at the 43rd Street store, where Rivera would start her training and be stationed. ¶ 113. After that text exchange, Sierra and Rivera did not text or speak again and Sierra had no further involvement in Rivera's employment. ¶¶ 115–116.

Rivera began work on July 27, 2021. ¶ 117. She met and had a conversation with Guzman on July 28th. ¶¶ 119, 183. Guzman and Rivera do not agree on the content of the conversation. Rivera claims that she asked Guzman for a bigger uniform because she was pregnant. *Id.* Rivera alleges that Guzman responded, "[Y]ou pregnant?! Why didn't you say anything in your interview?" ¶ 182. Rivera alleges that Guzman also said, "Another one with maternity leave without pay. Hold on, I have to sit down." *Id.* Rivera claims that Guzman said Rivera was "supposed to tell the company that you're pregnant. It is better for us to know sooner than later just in case anything happens," ¶ 183, and that "there was another pregnant who expected to have maternity leave and quit because we wouldn't give her maternity leave." *Id.* Rivera claims that she told Guzman her due date and that Guzman responded, "[Y]ou think you're going to get paid during maternity leave? Oh, so you're only going to be here for four months and then you're leaving?" and went on to state that "I don't think you qualify for maternity leave. I can look into it, but I don't think you qualify because you haven't been here over a year yet." ¶ 184.

Guzman disputes this account. Guzman says she was herself nine months pregnant and preparing to take maternity leave. ¶ 121. According to Guzman, Rivera asked if she could touch Guzman's pregnant belly. ¶ 186. Guzman claims she said yes, and that Rivera then shared that she was also pregnant. *Id.* Guzman claims that they discussed the process for maternity leave and Guzman offered to check whether Rivera would qualify for FMLA leave by her due date. *Id.*

Rivera attended her prenatal appointment on the 29th and then went to work. ¶ 126. On July 30th, Sam Alcala—one of the two HR Coordinators tasked with processing new-hire paperwork for PLS and its sister companies—began processing the paperwork that he had received on July 26th. ¶ 132. Processing was sometimes delayed by several days because Alcala and the other HR coordinator processed new-hire paperwork in order of receipt. ¶ 131. In reviewing the new-hire paperwork, Alcala followed PLS Hiring Guide Protocols and reviewed each new hire's assessment score, including Rivera's. ¶ 135. That's when Alcala discovered that Rivera only scored a 36 on her assessment. ¶ 133. Alcala therefore replied to the email submitting Rivera's paperwork stating that "[a]fter evaluating Jennifer's new hire paperwork, her assessment score was a '36', which is below the '50' minimal score. Due to the low score, she is unable to work for PLS and will be processed for termination and taken off the schedule." ¶ 134.

Other than processing her paperwork, Alcala had never heard of or met Rivera. ¶¶ 137–138. Alcala did not know Rivera was pregnant and did not learn about the pregnancy until his 2023 deposition in this case. ¶¶ 139–140.

Alcala authored a contemporaneous handwritten note to reflect all the new hires he processed on July 30, 2021, and the results for each employee. ¶ 143. Alcala's handwritten documentation for July 30, 2021, reflected that he instructed that Rivera's employment needed to be terminated because he discovered that she had received a failing assessment score. ¶ 144.

After receiving Alcala's email, Guzman called the 43rd Street Store and asked the manager on duty to tell Rivera that she was being terminated because she had not passed the assessment. ¶¶ 146–147. The parties agree that Rivera also spoke with Guzman, although they dispute what Guzman said during the conversation. ¶ 148. Defendants claim that Guzman told Rivera that she was terminated because she had not passed the assessment, while Rivera claims that Guzman said Rivera "should have been honest" about her pregnancy during the interview. *Id.*

## LEGAL STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A material fact is one that would affect the outcome of the suit under the governing law, and a dispute about a genuine issue of material fact occurs if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party." *Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 220 (2d Cir. 2023) (cleaned up). On a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 61 (2d Cir. 2023).

## DISCUSSION

At the outset, the Court grants defendants' motion for summary judgment on Rivera's retaliation claims. Rivera states that she is no longer pursuing these claims and so does not oppose defendants' motion as to those claims. *See* Dkt. 35 at 5. For the following reasons, the Court also grants defendants' motion in all other respects.

### I. Gender Discrimination

#### A. Title VII and NYSHRL

"A plaintiff can establish a *prima facie* case of pregnancy discrimination under Title VII by showing that: (1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) her position remained open and was ultimately filled by a non-pregnant employee" or that "the discharge occurred in circumstances giving rise to an inference of unlawful discrimination." *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995). If "the plaintiff demonstrates a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, clear, specific and non-discriminatory

reason for discharging the employee." *Id.* Finally, "if the defendant satisfies this burden of production, the plaintiff has the ultimate burden to prove that the employer's reason was merely a pretext for pregnancy discrimination," meaning that the reason is "false *and* that discrimination was the real reason." *Id.* The Court evaluates "discrimination claims brought under the NYSHRL according to the same standards that . . . apply to Title VII discrimination claims." *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010).

The parties agree that Rivera was a member of a protected class and that she was discharged. Even assuming that Rivera was qualified to be a CSR despite failing the assessment, Rivera still fails to make out a *prima facie* case of discrimination because she has not shown that her discharge occurred in circumstances giving rise to an inference of unlawful discrimination.[2] Rivera says she established such an inference because she was terminated "almost immediately" after she disclosed that she was pregnant to Guzman and Sierra, who she claims both responded negatively. Dkt. 35 at 17. But she admits that Alcala was the one responsible for initiating her termination; that he "followed PLS Hiring Guide Protocols and reviewed each new hire's assessment score," including Rivera's; that he "discovered that Plaintiff only had scored a 36 on the assessment, well below the required score of 50"; that his handwritten documentation "reflected that he instructed that Plaintiff's employment needed to be terminated because he discovered that she had received a failing score of '36' on the Assessment"; and that he "did not consult with anyone about the decision to terminate Plaintiff's employment." Dkt. 38 ¶¶ 134–36, 145.

Rivera's admissions also establish that Alcala did not know that Rivera was pregnant when he terminated her. She admits that prior to processing her paperwork, "Alcala had never heard of Plaintiff and did not know she was pregnant," that he "did not know that Plaintiff was pregnant when he processed her new-hire paperwork and determined that her employment needed to be terminated due to her failing Assessment score," and that he did not learn Plaintiff was pregnant "until he was deposed in this matter in June 2023 (long after he left PLS)." ¶¶ 137–140. At one point, Rivera denies that Alcala "did not discuss Plaintiff with Guzman or Sierra and did not consult either of them or anyone else before" terminating Rivera. ¶ 142; *but see* ¶ 141 (Rivera admitting that "Alcala did not know Guzman or Sierra, and had never met or spoken with either of them"); ¶ 145 (Rivera admitting that "Alcala did not consult with anyone about the decision to terminate Plaintiff's employment"). However, Rivera points to no evidence (admissible or otherwise) to support that Alcala ever spoke to Guzman or Sierra. Instead, Rivera just points to Guzman's alleged statement to Rivera that "you should have been honest [about your pregnancy] at the interview" as making things "suspicious." *Id.*; *see also* ¶ 163.

Rivera's suspicions would matter if there were evidence that Guzman or Sierra were in any way involved in the decision to terminate Rivera, but Rivera has not offered any such evidence in response to defendants' motion. *See Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir.

---

[2] Rivera doesn't argue on this motion that she could nevertheless make out a *prima facie* case by showing that the position remained open and was filled by a non-pregnant employee.

1985) ("[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment."); *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment.").

To the contrary, the only admissible evidence in the record is that Alcala was responsible for the decision, that he made that determination based on Rivera's failing assessment score, that he never spoke to anyone who was aware of Rivera's pregnancy and, as Rivera admits, that he didn't even know Rivera was pregnant until his deposition.

So even though Rivera was terminated soon after disclosing that she was pregnant to Sierra and Guzman, Rivera has failed to submit evidence that "the discharge occurred in circumstances giving rise to an inference of unlawful discrimination," *Quaratino*, 71 F.3d at 64, when the employee who fired her was not aware that she was pregnant and never spoke to anyone who knew she was pregnant. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 82 (2d Cir. 2005) ("[A] defendant's discriminatory intent cannot be inferred, even at the *prima facie* stage, from circumstances unknown to the defendant."); *see also Stainkamp v. Changes Int'l of Fort Walton Beach, Inc.*, 373 F. Supp. 2d 163, 167 (E.D.N.Y. 2005) (granting summary judgment when "Plaintiff has failed to adduce any evidence that Coggin was aware of her pregnancy at the time he made the decision to terminate her, and she has therefore failed to establish a *prima facie* case").

Even if Rivera met her initial burden, she would not be able to demonstrate that PLS's non-discriminatory reason for discharging her was pretextual. PLS claims Rivera was fired because of her low assessment score. Rivera admits that PLS required CSR applicants to score 50 or higher on a pre-employment assessment to be eligible for employment. Dkt. 38 ¶¶ 24–28, 30. While Rivera denies that this was a "hard and fast rule that PLS applied without exception," ¶ 29, Rivera is not able to identify any instance in which the requirement was waived. Rivera also admits that PLS could not somehow edit or alter an applicant's score. ¶¶ 35–36. Rivera further admits that on July 30, 2021, Alcala checked her assessment score (as required by the PLS Hiring Guide Protocols) and discovered that she had received a score of 36. ¶¶ 132, 135–136. Finally, she admits that Alcala wrote an email indicating that she would "be processed for termination and taken off the schedule" "[d]ue to [her] low score." ¶ 134. As noted above, at that time, Alcala was not aware that Rivera was pregnant and had never spoken to Guzman or Sierra. ¶¶ 134, 137–139, 140–141, 145.

Rivera attempts to demonstrate that this nondiscriminatory reason for her termination was pretextual. At the outset, none of Rivera's pretext arguments addresses the fact that the only evidence in the record indicates that Alcala was solely responsible for Rivera's termination, that he made the decision without consulting anyone else, and that Alcala was unaware of her pregnancy. ¶ 140. *See Willford v. United Airlines, Inc.*, 2023 WL 309787, at *5 (2d Cir. Jan. 19, 2023) (finding plaintiff alleging pregnancy discrimination did not establish pretext because she did not allege that the person who terminated her was biased and could not show that the decision

to terminate her was influence by anyone else's bias). But even ignoring this issue, Rivera's pretext arguments fail for additional reasons.

First, Rivera claims that when she pressed Guzman on whether she was being terminated because she was pregnant, Guzman said Rivera should have been honest about her pregnancy during the interview. Dkt. 35 at 21; Dkt. 38 ¶ 228. She also claims that Guzman incorrectly told PLS's payroll specialist that Rivera quit, which "casts doubt" on Guzman's "veracity." Dkt. 35 at 21. But even accepting Rivera's assertions as true, these events all occurred *after* Alcala had processed Rivera's termination and do not suggest that Guzman played a decision-making role in Rivera's termination or spoke to any decision-makers.

Second, Rivera points to Sierra's text stating that she "passed the test" as evidence that PLS's explanation is pretextual. Dkt. 35 at 17. But Sierra sent this text the day after Rivera had passed the background check and drug test. Dkt. 38 at ¶¶ 95–96. And Rivera testified that "[a]s far as [she] understood," Sierra was "letting [her] know [she] passed the background test and the drug test." Dkt. 29-3 at 83:10–14. Plus, even if Sierra had mistakenly said that Rivera passed the assessment, that would not demonstrate that defendants' nondiscriminatory explanation is pretextual, because the undisputed evidence in the record is still that Rivera really did fail. Rivera concedes that the assessment is administered by a third party and PLS cannot alter an applicant's score. Dkt. 38 ¶¶ 24, 35–36. And PLS provided a copy of Rivera's assessment results. Dkt. 29-18. While Rivera claims that defendants' screenshot of the assessment results are "blurry," Dkt. 38 ¶ 44, a clear copy of the results is attached as an exhibit to defendants' motion and was produced during discovery, *see* Dkt. 29-18.

Finally, Rivera claims that PLS's reason for firing her was pretextual because accidentally hiring a candidate with a disqualifying test score was too unusual to be true. Rivera cites Guzman's testimony that she had not hired any other candidates with disqualifying scores and Alcala's inability to specifically describe details about other similar instances. Dkt. 35 at 16–17. Sierra also testified that she could not think of any other time that she had interviewed a candidate without looking at their assessment score. Dkt. 36-5 at 55:14–18. But the record reveals that this occurrence was not unheard of. Alcala testified that, between June 2021 and September 2022, he had handled "around 10" instances when an employee was hired even though they did not receive a qualifying assessment score. Dkt. 29-7 at 22:4–13, 17:8–19. Similarly, Andrea Preston—PLS's Senior Director of Human Resources and PLS's Federal Rule of Civil Procedure 30(b)(6) witness—testified that she was aware of approximately 20 such instances between 2018 and June 2022. Dkt. 29-4 at 107:16–109:5.

The record also shows that another candidate with a disqualifying score (referred to by her initials, AG) applied to work for PLS on June 23, 2021 (the same day as Rivera), was hired, and then was terminated a few days after Rivera. Dkt. 36-2. While Rivera disputes how long it took PLS to terminate AG, she does not appear to dispute (nor can she) that AG was also terminated

once the failing assessment score was discovered. Dkt. 38 ¶ 171.[3] So Rivera cannot identify a single example of PLS waiving the test score requirement for a CSR candidate.

Moreover, defendants explained the circumstances that led to Rivera's erroneous hiring: Rivera was being interviewed to work at a store that had no store manager and when Sierra was asked to fill in for the interview, she assumed Guzman had already verified Rivera's assessment score. Dkt. 38 ¶ 20, 89. Rivera does not point to any facts in the record undermining this explanation.

"The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient" to defeat summary judgment. *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (cleaned up). Instead, "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* Here, no such evidence exists. Rivera was terminated by an employee who did not know she was pregnant and had not spoken to anyone who knew she was pregnant. *See Lambert v. McCann Erickson*, 543 F. Supp. 2d 265, 283 (S.D.N.Y. 2008) (granting summary judgment to defendants on Title VII discrimination claim because "there can be no question that Mars and Thomas . . . who were unaware that plaintiff was pregnant, acted without discriminatory intent."). Moreover, defendants have demonstrated a neutral, non-pretextual reason for her termination: a test score that was below company requirements.

Rivera's discrimination claims under Title VII and the NYSHRL therefore fail.

### B. NYCHRL

Rivera also brings a claim for discrimination under the NYCHRL. The NYCHRL must "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions worded comparably to provisions of [the NYCHRL], have been so construed." N.Y.C. Admin. Code § 8-130. The Court must therefore evaluate Plaintiff's NYCHRL claim "separately and independently" from her federal and state law claims. *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 410 (2d Cir. 2015).

Under the NYCHRL, it is unlawful discrimination for an employer "[t]o refuse to hire or employ or to bar or to discharge from employment" an employee based on gender. N.Y.C. Admin. Code § 8-107(1)(a)(2). "Pregnancy discrimination is a form of gender discrimination under the NYCHRL." *Chauca v. Abraham*, 841 F.3d 86, 90 n.2 (2d Cir. 2016). To bring an NYCHRL discrimination claim, "the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013). An employer is entitled to summary judgment "only if the record establishes as a matter of law that 'discrimination play[ed] *no* role' in its actions." *Id.* (quoting

---

[3] Rivera repeatedly argues that AG was "not terminated for several months" despite her failing assessment. Dkt. 35 at 22. This is untrue. AG's application profile clearly shows that she took the assessment in December 2020, applied for the position on June 23, 2021, and was terminated on August 4, 2021. Dk. 36-2. Rivera does not submit any evidence potentially undermining this chronology.

*Williams v. N.Y.C. Hous. Auth.*, N.Y.S.2d 27, 38, 40 n. 27 (N.Y. App. Div. 2009)); *accord Montgomery v. N.Y.C. Transit Auth.*, 806 F. App'x 27, 31 (2d Cir. 2020).

Here, summary judgment is warranted because Rivera cannot show that she was treated "less well" than any other employee. As already explained, and as Rivera admits, HR was required to confirm that a new hire received a qualifying assessment score and, if not, to process the new employee's termination. Dkt. 38 ¶¶ 64–69. Indeed, as mentioned above, AG applied to PLS with a disqualifying score the same day as Rivera, was also hired for a position, and was terminated a few days after Rivera. Dkt. 36-2. And Rivera has failed to adduce evidence that discrimination played a role in her termination because, as already explained, the employee responsible for terminating her did not know she was pregnant, as Rivera admits. Dkt. 38 ¶¶ 134, 137–139, 141. Even if Guzman and Sierra made inappropriate comments to Rivera about her pregnancy, there is no evidence in the record that they spoke to Alcala or played any role (direct or indirect) in Rivera's termination. ¶ 145.

## II. Aiding and Abetting

Rivera also brings claims against Guzman for aiding and abetting PLS's discrimination in violation of the NYCHRL and NYSHRL. *See* Compl. ¶¶ 71–74, 83–85. "The same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to such claims under the NYCHRL because the language of the two laws is virtually identical." *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (internal quotation marks omitted). "A precondition to a valid aiding and abetting claim under the NYSHRL or NYCHRL is a demonstration of a valid primary claim for discrimination or retaliation." *Rossbach v. Montefiore Med. Ctr.*, 2021 WL 930710, at *7 (S.D.N.Y. Mar. 11, 2021); *see also Falchenberg v. N.Y. State Dep't of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009). Rivera has not established a primary claim for discrimination or retaliation, so her aiding and abetting claims also fail.

## III. WTPA

Defendants move for summary judgment with respect to Rivera's WTPA claim. The WTPA provides that employers must "furnish each employee with a statement with every payment of wages," that includes certain information regarding the employer, the employee, and the employee's wages. N.Y. Lab. Law § 195(3). An employer's failure to provide these statements may result in "damages of two hundred fifty dollars for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars." *Id.* § 198(1-d).

Defendants argue that Rivera's claims must be dismissed because she has "not identified any actual injury." Dkt. 28 at 32. "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). To pursue a WTPA claim in federal court, a plaintiff cannot simply "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* If the statutory violation involves "informational injury," she must identify "downstream consequences from failing to receive the required information" because "informational injury that causes no adverse

9

effects cannot satisfy Article III." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021) (internal quotation marks omitted).

Therefore, to have standing to bring a WTPA claim, Rivera must show that she suffered an injury stemming from the statutory violation. *See Chen v. Lilis 200 W. 57th Corp.*, 2023 WL 2388728, at *8 (S.D.N.Y. Mar. 7, 2023) ("In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation."); *see also Neor v. Acacia Network, Inc.*, 2023 WL 1797267, at *4 (S.D.N.Y. Feb. 7, 2023) ("Plaintiffs here lack standing because they fail to demonstrate how the lack of accurate wage notices and statements led to either a tangible injury or something akin to a traditional cause of action." (internal quotation marks omitted)).

Here, there is no evidence (either disputed or undisputed) that Rivera suffered any harm from defendants' failure to provide her with the required wage notices. At the outset, the record indicates that Rivera was made aware of much of the information that would have been contained in the WTPA notices. Dkt. 38 ¶ 216 (Rivera admitting that she was advised of her rate of pay and the address and telephone number of PLS's main office and principal location). And even if she wasn't provided certain information, there is no evidence that any informational injury harmed Rivera. Indeed, Rivera has not claimed at any point in this lawsuit that she was paid less than full, New York Labor Law–compliant wages.

On this record, the Court finds that Rivera has not demonstrated any injury from this statutory violation and must dismiss Rivera's WTPA claim without prejudice for lack of standing.[4]

## CONCLUSION

Defendants' motion for summary judgment is GRANTED as to Rivera's claims under Title VII, the NYCHRL, and the NYSHRL. Rivera's claims under the WTPA are DISMISSED without prejudice for lack of standing. The Clerk of Court is directed to terminate Dkt. 27 and close the case.

SO ORDERED.

Dated: January 24, 2024
New York, New York

ARUN SUBRAMANIAN
United States District Judge

---

[4] State courts are not similarly bound by this standing requirement. But even in state court, the WTPA provides that "it shall be an affirmative defense that . . . the employer made complete and timely payment of all wages due." N.Y. Lab. Law § 198.